**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **AFFIDAVIT IN SUPPORT OF** | ) |
| **CRIMINAL COMPLAINT** | ) |
| **FOR:** | ) |
| | ) |
| **Sean Pratt** | ) |
| | ) **Case No. 16-MJ-5116-JGD** |
| | ) |
| | ) |
| | ) |
| | ) |

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

**A.** **Introduction**

1.      I, John H. Hayes, Senior Special Agent, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), United States Department of Justice, being duly sworn, state as follows in support of my application in support a criminal complaint for Sean Pratt with the charge of possession with the intent to distribute heroin, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C).

2.      I am an "Investigative or Law Enforcement Officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

3.      I have been employed as an ATF Special Agent since January of 2000.  Prior to that, I was employed as an Intelligence Research Specialist with the United States Drug Enforcement Administration ("DEA") for approximately one and a half years, where I received training in narcotics trafficking, interdiction, and asset forfeiture investigations.  I am currently assigned to the ATF Field Office in Bridgewater, Massachusetts with investigative responsibilities for areas south of Boston, including Cape Cod.

4.      Prior to this assignment, I was assigned for three years to the Organized Crime Drug Enforcement Task Force ("OCDETF") Boston Strike Force, which is a strike force incorporating various law enforcement agencies, including ATF, the DEA, the Federal Bureau of Investigation ("FBI"), Homeland Security Investigations ("HSI"), and the U.S. Marshals Service ("USMS"), among other agencies.  I am a graduate of the ATF National Academy and the

Criminal Investigator School located at the Federal Law Enforcement Training Center in Glynco, Georgia.

5.　　　Since becoming a Special Agent with the ATF, I have conducted numerous investigations concerning unlawful drug possession, importation and distribution in violation of Title 21, United States Code, Sections 841(a)(1), 843(b), 846, 952, 960 and 963, as well as the unlawful possession and use of firearms in furtherance of drug trafficking and crimes of violence in violation of Title 18, United States Code, Sections 924 (c), 1951, and 1959.  I have extensive experience reviewing intercepted and recorded conversations between target subjects, amongst others.  I also have participated in physical surveillance, the introduction of undercover agents, the execution of search warrants, debriefings of defendants, informants and witnesses, and the review of telephone, financial, and drug records.  Through my training and experience, I have become familiar with the manner in which illegal drugs are imported, transported, stored, and distributed, and the methods of payment for such drugs.  I have also become familiar with the manner in which narcotics organizations utilize various forms of violence and intimidation in furtherance of their narcotics trafficking activity to protect their operations, members, narcotics, and narcotics proceeds.

### B.　　　Introduction to the CHISHOLM DTO

#### 1.　　　Case background and Overview

6.　　　I am currently participating in the investigation of the Denzel CHISHOLM drug trafficking organization (hereinafter "CHISHOLM DTO" or "DTO"), which is also known as the NAUTI-BLOCK street gang (hereinafter "GANG"), named after the area in which many members of the gang were raised.  This large-scale criminal organization distributes fentanyl,

3

heroin and cocaine, to drug dealers and drug users.  Additionally, the CHISHOLM DTO/GANG

relies upon the possession and use of firearms to further their drug trafficking activities and to

collect significant proceeds from their criminal activities.

7.     Denzel CHISHOLM is a Yarmouth-based heroin dealer, and he has been, together

with the below-mentioned individuals, separately charged at 16-MJ-5114-JGD.  I believe that

CHISHOLM and WILKINS pool money together and purchase heroin from a common source,

which they then distribute to their customers, who include Oliver HAMILTON, Brooke

COTELL, **Sean PRATT**, Shaun MILLER, Tyrone GOMES, Stephanie DAVIS, Anthony HALL

and Benjamin RODERICK.  However, to avoid law enforcement detection, the CHISHOLM

DTO has involved numerous other persons in their drug distribution organization, and these

people rent cars for members of the DTO, open bank accounts for members of the DTO,

purchase airline tickets for the DTO, and perhaps most importantly, provide residences at which

the DTO members store their heroin and other narcotics.  As examples, Eelyese MATEO, a

girlfriend of CHISHOLM, stores heroin at her home on CHISHOLM's behalf, and she also

delivers heroin to CHISHOLM's customers.  Bethanne HUTCHINGS, who lives at 43 Erin Lane

in Hyannis, allows DTO members to store heroin at her home and sell heroin out of her home,

and she does this, investigators believe, in exchange for heroin for personal use.

8.     The Government's evidence has come from a variety of sources, including:

debriefings with cooperating individuals, controlled purchases of heroin from CHISHOLM,

WILKINS and multiple other individuals, tracking and search warrants previously executed,

regular surveillance of targets and target locations, pole cameras, and car stops.  In addition,

4

since mid-October, 2015 investigators have been intercepting the wire and electronic

communications of members of the CHISHOLM DTO, as authorized by District Judges F.

Dennis Saylor IV and Denise J. Casper.   *See* 15-MC-91335-FDS.

> **2.     Wire and electronic interceptions commenced on October 19, 2015 and are continuing.**

9.      Pursuant to authorizations from Judges Saylor and Casper of the District of

Massachusetts, investigators have, between October and March, 2016, intercepted 17 telephones

used by members and associates of the CHISHOLM DTO.  By a finding of probable cause,

Judges Saylor and Casper found that the persons set forth in those wiretap affidavits were using

the telephones described in those affidavits, and further, that the telephones were being used in

furtherance of narcotics trafficking, amongst other crimes.  These findings are incorporated

herein.

10.      Investigators first began intercepting telephone 774-451-3598 (TARGET

TELEPHONE 1) on October 19, 2015.  At that time, TARGET TELEPHONE 1 was used by a

low-level CHISHOLM DTO member referred to herein as co-conspirator 1 ("CC-1").1

Interceptions over TARGET TELEPHONE 1 ceased on November 12, 2015.   Based on my

interception of the calls and text messages, when coupled with surveillance, interceptions over

TARGET TELEPHONE 1 demonstrated that CC-1 was being supplied small quantities of heroin

for distribution by another member of the DTO ("CC-2").

---

1 A number of co-conspirators of CHISHOLM have been identified during this investigation and identified by name in the accompanying wiretap affidavits.  These co-conspirators are not being charged in this complaint at this time, and hence, are referred to as "co-conspirator" or "CC-x".

11.     On November 6, 2015, investigators began interceptions of TARGET TELEPHONE 2 (774-451-3598), as used by CC-2.  These interceptions continued until November 20, 2015.  During these interceptions, investigators learned that CC-2 was coordinating distribution of heroin and other narcotics in the Hyannis area of Cape Cod with his co-conspirator Denzel CHISHOLM.  CC-2 stopped using TARGET TELEPHONE 2 in mid-November, 2015 and switched to using TARGET TELEPHONE 4.  Investigators commenced interceptions of 774-244-9599 (TARGET TELEPHONE 4) on December 10, 2015.

12.     On December 1, 2015, investigators began interceptions of TARGET TELEPHONE 3 (774-521-5200), as used by Denzel CHISHOLM.  These interceptions showed that Denzel CHISHOLM was bulk heroin for redistribution from New Bedford, MA.  Further, before intercepting CHISHOLM's TARGET TELEPHONE 3, investigators had seized heroin from Brooke COTELL and Shaun MILLER, who, as described below, had just purchased this heroin from CHISHOLM.

13.     On January 12, 2016, investigators commenced interceptions of CHISHOLM's 508-375-5610 (TARGET TELEPHONE 5), WILKINS' TARGET TELEPHONES 6 (508-207-0756) and 7 (508-566-0282), and CC-2's TARGET TELEPHONE 8 (508-815-6693).  CHISHOLM soon stopped using TARGET TELEPHONE 5, and on January 29, 2016, investigators commenced interceptions of CHISHOLM's 508-375-5694 (TARGET TELEPHONE 9).  Interceptions of CHISHOLM's TARGET TELEPHONE 9 have shown that CHISHOLM continued to distribute large amounts of heroin to persons such as Tyrone GOMES and others, while interceptions of WILKINS' TARGET TELEPHONES 6 and 7 have shown that

WILKINS was primarily distributing heroin to small and mid-size drug dealers on Cape Cod. Finally, interceptions of CC-2's TARGET TELEPHONE 8 showed that CC-2 primarily assisted with obtaining bulk heroin for distribution from places such as New Bedford.

14.     On February 26, 2016, investigators commenced interceptions of TARGET TELEPHONES 10 through 15, and continued the interceptions of CHISHOLM's TARGET TELEPHONE 9.  TARGET TELEPHONE 10 (774-260-7143) was used by Christopher WILKINS, TARGET TELEPHONE 11 (508-280-5343) was used by Jason MELLO, TARGET TELEPHONE 12 (508-524-9358) was used by Tyrone GOMES, TARGET TELEPHONE 13 (774-297-3661 was used by co-conspirator 4 ("CC-4"), TARGET TELEPHONE 14 (508-375-5855) was another phone used by CHISHOLM, and TARGET TELEPHONE 15 (832-412-5625) was a phone used by CC-2.  These interceptions have confirmed investigators' beliefs and have shown that CHISHOLM, CC-2 and WILKINS continue to traffic in heroin and coordinate the trafficking of said heroin, and that they supply heroin to persons such as MELLO, Stephanie DAVIS and **PRATT**.  Finally, on March 23, 2016, investigators commenced interceptions of two additional telephones used by CHISHOLM (TARGET TELEPHONE 16; 508-375-5417 and TARGET TELEPHONE 17: 307-757-8236), and continue interceptions of MELLO's TARGET TELEPHONE 11.  These interceptions are continuing.

**C.     Denzel CHISHOLM is a large-scale heroin distributor in Barnstable who provides heroin to numerous other drug dealers, including Sean PRATT.**

15.     The investigation into the CHISHOLM DTO has shown that CHISHOLM engages in the distribution of heroin (and other narcotics) on a near constant basis in Barnstable

and Bristol counties in the District of Massachusetts.  As set forth below, CHISHOLM

distributes narcotics (primarily heroin) to a number of other drug dealers, including, as pertinent

here, Sean PRATT.  In a search warrant executed on April 5, 2016, approximately 48 grams of

heroin was found in PRATT's home, located at 148 Starlight Drive in Hyannis, MA.

      16.     On February 19, 2016 investigators were conducting surveillance in conjunction

with intercepting CHISHOLM's telephone calls.  In a text message from 508-815-9804 (later

identified as belonging to Sean PRATT), PRATT told CHISHOLM, "Yo I can meet u around 3

that work … And I got 200 to trade."  CHISHOLM responded, "Yup that's good."   Based upon

my training and experience as well as my knowledge of the case, I believe that PRATT was

arranging to "swap" 200 grams of lesser quality heroin for 200 grams of higher quality heroin

("200 to trade").  Previously intercepted telephone calls indicated that CHISHOLM had been

distributing poor quality heroin and as a result, he had received numerous customer complaints.

In later intercepted text messages and a telephone call, CHISHOLM directed PRATT to meet

him on Sudbury Lane in Hyannis, MA.  As noted above, until recently co-conspirator

Christopher WILKINS lived at 263 Sudbury Lane in Hyannis.

      17.     Prior to this meeting, at approximately 11:42 a.m., investigators conducting

electronic surveillance watched as CHISHOLM arrived at 43 Erin Lane in Hyannis, MA.

Investigators believe, as detailed herein, that 43 Erin Lane is a heroin stash house owned by

Bethanne HUTCHINGS and used by CHISHOLM, WILKINS and others to store heroin.

Approximately one hour later, CHISHOLM sent a text message to MATEO and told her that he

had a "mission" for her.  MATEO responded that she would meet CHISHOLM at the "Circle"

off "Pitch," meaning off Pitcher's Way in Hyannis, MA.  At approximately 1:08 p.m., MATEO

called CHISHOLM and asked if she should "come inside."  Investigators conducting electronic

surveillance saw MATEO arrive at 43 Erin Lane, Hyannis, MA, get out of her SUV, and then

enter the home (43 Erin Lane).  MATEO carried with her a white bag.  Approximately eight

minutes later, MATEO left Erin Lane carrying the same white bag, got in her SUV, and drove

away.  Investigators followed MATEO as she drove back to her residence at 62 Beth Lane,

Hyannis, MA.  MATEO then got out of the SUV and entered her residence carrying the white

bag.

  18. At approximately 1:20 p.m., CHISHOLM and WILKINS left 43 Erin Lane,

Hyannis, MA.  CHISHOLM got in his Kia rental car and WILKINS walked down the driveway.

CHISHOLM backed out of the driveway and drove to 263 Sudbury Lane in Hyannis, MA.

Shortly before CHISHOLM arrived at 263 Sudbury Lane, MATEO called CHISHOLM and

asked if she was "still going there."  CHISHOLM responded, "Yes," and that he was "already

there."  MATEO replied that she was on her way.  At approximately 1:29 p.m., MATEO arrived

at CW-2 Residence in her SUV.  MATEO got out of the car with a white bag in hand and walked

into CW-2 Residence.  Based on the sequence of events that follow, I believe that MATEO

brought with her the heroin that CHISHOLM would then provide to PRATT.

  19. At approximately 2:08 p.m., investigators intercepted a call from PRATT to

CHISHOLM telling PRATT to drive to the end of Sudbury Lane.  Investigators conducting

surveillance saw PRATT, driving a Chevy Tahoe, arrive at 263 Sudbury Lane in Hyannis.   Prior

to PRATT's arrival at Sudbury Lane, investigators had seen CHISHOLM park in the driveway

of CW-2 Residence.  Investigators watched PRATT enter the residence.  At approximately 2:56

p.m., investigators saw PRATT leave the residence, and he drove away in his Chevy Tahoe.

Two minutes later, MATEO left 263 Sudbury Lane carrying the same white bag.  At

approximately 3:00 p.m., police officers conducted a vehicle stop of PRATT's Chevy Tahoe on

Route 28 in Hyannis.  In a search incident to that vehicle stop, no narcotics were found; however,

the sole occupant of the vehicle was identified as PRATT.

20.     The next day, at approximately 10:22 a.m., PRATT sent a text message to

CHISHOLM stating "O lol yea turned my jack off was made shook after getting posted lol."

Based on my training and experience, I believe that PRATT was commenting on why he did not

answer CHISHOLM's phone calls the night before.  PRATT had turned his phone ("jack") off

after the police had stopped him ("after getting posted").   CHISHOLM then asked where

PRATT had been "posted," and PRATT wrote back that he had been stopped "pullin' into the

pet store by the school after I left you they kept talking about guns thou cuz someone's bin

shootin up houses in Hyannis."

21.     CHISHOLM then called PRATT on the telephone, and in the call they discussed

the fact that PRATT had been stopped and searched by the police, but the police did not find the

heroin inside PRATT's car:

**CHISHOLM**: Yo, what they um get you right after I seen you?

**PRATT**:       Yeah.

**CHISHOLM**: They didn't say nothing crazy?

**PRATT**:       Nah, they were talking about some fucking shooting shit, asking if I had
weapons whatever.

10

**CHISHOLM**:  They didn't search you or nothing?

**PRATT**:        Nah, they pulled me out on some illegal bullshit.  They didn't even have a reason to pull me over but, fucking pulled me over, searched my whip and didn't find nothing.  I mean that's a ill spot but…

**CHISHOLM**:  Damn, that might a been my fault.

**PRATT**:        He was mad surprised he didn't find nothing though.  Said you can go, got nothing.

**CHISHOLM**: It's crazy, cause where were you at Cape Maid Farms?

**PRATT**:        Yeah.

**CHISHOLM**:  Damn we seen them at Cape Maid Farms but it was like after, there was like undercovers and shit.

**PRATT**:        It was a silver whip with some little skinny dude with a goat tee I never even seen him before.

**CHISHOLM**: They were in uniforms?

**PRATT**:        No, no uniform, they were both in street clothes and some old dude too.

**CHISHOLM**: Was one of them bald? Bald dude?

**PRATT**:        No, one of them was wearing a baseball hat so…

**CHISHOLM**: As long as you're good, but from now on we're gonna have to do something different cause I think they be tryna be on me you know what I'm saying.

**PRATT**:        I feel you that shit had me…fuckin'.

**CHISHOLM**: I'm not tryna, imma figure something out.

**PRATT**:        Nah, yeah yeah.  I'm good for a little bit so.

**CHISHOLM**: You test that shit out yet?

**PRATT**:        Nah, after that I just shut down for the night.

11

22.     Notably, I believe that this call confirms that CHISHOLM had sold heroin to PRATT.   PRATT told CHISHOLM that he had the drugs hidden in a compartment within the car ("ill spot"), and then CHISHOLM asked PRATT if he had tested the heroin yet ("[y]ou test that shit out yet?").   PRATT had not tested the heroin, I believe, because he had been scared due to the police stop ("I just shut down for the night").   Finally, investigators believe that CHISHOLM blamed the car stop on himself ("that might a been my fault") because, I believe, albeit correctly, that CHISHOLM thinks that law enforcement was watching him.

23.     On the morning of April 5, 2016, investigators executed a search warrant at PRATT's home, located at 148 Starlight Drive in Marstons Mills, MA.   Once inside the home, investigators found PRATT.   Investigators went into PRATT's bedroom where they located PRATT, as well as a firearm and PRATT's identification near the firearm.   PRATT was then given *Miranda* warnings, after which he told investigators that he had heroin in his bedroom's door-jam.   Investigators then recovered approximately 48 grams of a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance, from this door-jam. Based on my training and experience, I believe this amount of heroin is more than for personal use, and that PRATT intended to distribute this heroin.   This recovery of heroin is consistent with the intercepted telephone calls mentioned above.

**D.**   <u>**Conclusion**</u>

24.   Based on the information provided above, I believe that there is probable cause to

believe that on April 5, 2016, Sean PRATT possessed heroin with the intent to distribute.


_____
JOHN H. HAYES
Senior Special Agent
Bureau of Alcohol, Tobacco, Firearms and
Explosives

Subscribed and sworn to me this the 5th day of
April, 2016.

_____
HON. M. PAGE KELLEY
United States Magistrate Judge
District of Massachusetts



13